UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| VICTORIA C. VOEGEL, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No. 23-cv-1459 |
| OBSTRETRICS AND GYNECOLOGY CARE ASSOC., S.C., | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION

Plaintiff Victoria C. Voegel ("Voegel") brings this suit against her former employer Obstetrics and Gynecology Care Associates, S.C.'s ("OB/GYN Care") alleging disability discrimination and retaliation in violation of Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and Illinois Human Rights Act, 775 ILCS 5/2-102 *et seq.* ("IHRA"). (D. 5). OB/GYN Care's now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D. 10). For the following reasons, the motion is denied as to Voegel's discrimination claims (Counts I and III) and granted as to her retaliation claims (Counts II and IV).

### I.     BACKGROUND

The following facts are not in dispute. OB/GYN Care is an Illinois medical corporation that provides obstetrics and gynecology care to patients in Bloomington, Illinois. Dr. Joseph Santiago, M.D., is the sole shareholder of OB/GYN Care and is responsible for the hiring and firing of OB/GYN Care's staff. Voegel worked at OB/GYN Care as a physician's assistant from January 3, 2005, until November 18, 2021. A physician's assistant is a mid-level provider, who provides direct care to patients.

1

Starting in 2015, and continuing through 2020, Voegel underwent various orthopedic surgeries on her lower extremities. Voegel's first surgery was on her ankle/foot in January 2015.[1] Following this surgery, Voegel was out of work for several months. (D. 10-5). In December 2016, Voegel underwent a total left knee replacement. Post-surgery, Voegel experienced challenges walking and standing for extended periods of time. OB/GYN Care was aware of this, and accommodated Voegel by supplying her with assistive devices, such as a "knee scooter" and rolling computer laptop.

Following her left knee replacement, Voegel continued to experience knee problems. Ultimately, she had a revision total knee replacement on October 21, 2020, and was out of work for several weeks.[2] Prior to her revision total knee replacement, Voegel had an episode at work where her knee buckled, and she fell. Voegel did not sustain acute injuries, but both Dr. Santiago and OB/GYN Care's then office administrator, Laura Weigand, were aware of her fall. While it is not clear when exactly she returned to work, she was back at work by her post-surgical follow-up on January 29, 2021.

While Voegel was out of work following her revision total knee replacement, OB/GYN Care hired Blythe Carroll as an office manager to replace Wiegand. Carroll started at OB/GYN Care on November 16, 2020. Carroll was aware that Voegel had mobility issues, and that those issues did not prevent her from doing work as a physician's assistant. OB/GYN Care was also aware of Voegel's continued orthopedic issues, that she wore a right knee brace, and used assistive walking devices to ambulate around the office.

---

[1] Although the Statements of Undisputed Facts do not elaborate on what this surgery was for, it appears from Voegel's Response to First Set of Interrogatories that she "had ankle/foot surgery on 01/01/2015 due to an ankle injury" and that she suffered from, and continues to suffer from, Charcot's Joint of the ankle. (D. 12-1, p. 2).

[2] According to Voegel's attorney at oral argument on 11/20/2025, Voegel was out of work for nine weeks following her October 21, 2020, revision total knee replacement.

In 2019, OB/GYN Care hired a second mid-level provider, nurse practitioner Amanda Boitnott, who did not suffer from a physical disability. Prior to hiring Boitnott, Voegel had been OB/GYN Care's only mid-level provider. Voegel generated more revenue as OB/GYN Care's only mid-level provider (in 2017 and 2018) than she did after Boitnott was hired (2019-2021). Despite hiring a second mid-level provider, the revenue generated by Voegel in 2019 was 71.5% of the revenue she generated in 2017. In 2020, the revenue Voegel generated was 49.7% of the revenue she generated in 2017. However, several other factors contributed to Voegel's decrease in her 2020 revenue including the COVID-19 pandemic and her absence from work following her revision total knee replacement surgery. As a result of Voegel's absence, Boitnott was OB/GYN Care's only mid-level provider generating revenue from patients for a majority of the last quarter of 2020.

On June 1, 2021, Carroll had a meeting with Voegel to discuss her declining revenue numbers. At that meeting, Carroll presented Voegel with a "Provider Revenue Summary," which stated:

> In reviewing recent revenue summary reports, we have noticed a significant decrease in generated revenue since 2017. Please see attached graph. Now, in the most recent years, we understand that there are many contributing factors that could cause this decrease. To help you generate more revenue to the practice we will be opening clinic hours for you on Thursday mornings. We will monitor this over the next 30 and 60 days. We will need to see a 5-10% increase or we will have no choice but to do a reduction in your salary….This was decided based on the fact that your current salary is based off a 40 hour work week and only working in office 30 hours….this is a matter of business and not personal.

(D. 10-6, p. 1).

According to that graph, the amount of revenue Voegel generated in 2017-2020, was as follows: $407,834.98 (2017); $406,730.15 (2018); $291,611.38 (2019); and $202,940.35 (2020). *Id.* at p. 2. Carroll projected Voegel's revenue for 2021 would be $181,471.60, should her work

3

performance not improve. "In making that projection, Carroll used data showing that Voegel's revenue for the first five months of 2021 was $75,613.17, and Carroll annualized that number to predict that Voegel would generate $181,471.60 for all of 2021, should her work performance not improve." (D. 10, ¶ 23; D. 11, ¶ 1). In other words, Voegel average monthly revenue for the first five months of 2021 was $15,122.53.[3] At the end of this meeting, Voegel signed the "Provider Revenue Summary" acknowledging receipt. Following this meeting, Voegel increased her revenue numbers and by the end of June 2021, Carroll projected that Voegel's revenue for 2021 would be $190,780.24, and by the end of October Carroll was projecting Voegel's revenue to be $196,655.37. In the sixty days following the June 1st meeting, OB/GYN Care did not meet with Voegel or otherwise notify her that she was not meeting their expectations.

The next time Carroll met with Voegel was on November 11, 2021. During this meeting, Carroll presented Voegel with a new "Employment Proposal," which stated:

> In the past several years you have not been able to see the expected number of patients per day. With this your individual provider revenue has decreased drastically. Your average high for patient value was 2,454.25 encounters. Now your average patient volume is 1,755 encounters which is about a 30% decrease. Due to this change, OBGYN Care had to look at the big picture of how this was affecting the business. We would like to offer you a new proposal.
>
> Proposal:
> - Clinic Time would be Monday and Wednesday 7:30a.m. – 4:30 p.m.
> - Assisting Geri would be Tuesday and Thursday 7:30a.m. – 4:30p.m.
> - Total working hours per week – 34
> - No longer a Salary Employee
> - New hourly rate would be $33.00/hour
> - No longer on OBGYN Care cell plan, will reimburse $50/month
> - Full Benefits
> - No reduction in PTO
>
> During your clinic time you would be expected to see on average 15 patients per day. Assisting Geri will consist of completing Tasks, Med Refills, FMLA paperwork, etc.

---

[3] $75,613.17 divided by 5 months (Jan.–May, 2021) = $15,122.53.
$15,122.53 x 12 (annualized) = $181,471.60.

(D. 10-9, Carroll's Affidavit, Exh. H "Employment Proposal"). If Voegel did not accept the terms of this Employment Proposal, OB/GYN Care alternatively offered her a severance package. Carroll also told Voegel this decision was due to her "…increasing inability to see the quantity of patients she had seen in the past, and her inability to safely perform certain job-related procedures for OB/GYN Care's patients." (D. 12, p. 8). That same day, OB/GYN Care also received a written statement from another employee, Cori Martinez, which stated: "I spoke to [Carroll] about my concern with Vicki Voegel's fingers and hand function. I had noticed recently her struggles with using her computer and phone. She also has been having trouble opening and closing wrappers and lids." (D. 11, p. 14; D. 12, p. 7).

The following day, Carroll and Dr. Santiago met with Voegel to give her the choice between the accepting the new Employment Proposal or severance. At this meeting, Voegel stated that she believed Dr. Santiago was trying to get rid of her because of her mobility issues and the fact that she was a perceived liability risk. Dr. Santiago denied this and told her the new employment proposal was a financial decision. Voegel subsequently left for a prescheduled vacation without clearly announcing her intent to quit her employment. She returned on November 18, 2021, to remove her belongings from OB/GYN Care. At the time she left, the amount of revenue Voegel had generated for 2021 was $180,020.88. This was only $1,450.72 less that what Carroll predicted Voegel's revenue would be for 2021 at the June 1st meeting and doesn't include any revenue from Voegel for at least half of November and all of December.[4]

## II.    LEGAL STANDARD

---

[4] $181,471.60 (Carroll's projection for Voegel's 2021 revenue on June 1, 2021) - $180,020.88 (Voegel's revenue through November 12, 2021) = $1,450.72.

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024) (citing *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). When presented with a motion for summary judgment, the Court must construe "the record in the light most favorable to the nonmovant and "avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. 317 at 323 (internal quotations omitted). Once the moving party has met its burden, the adverse party "may not rest upon mere allegations or denials of his pleading, but…must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* at 252.

### III.     DISCUSSION

Voegel's Amended Complaint brings claims for disability discrimination under the ADA (Count I), and under the IHRA (Count III), retaliation in violation of the ADA (Count II), and

retaliation in violation of the IHRA (Count IV). (D. 5). OB/GYN Care moves for summary judgment on all the claims. In Voegel's Response, she clarifies the scope of her claims. First, Voegel explains that her claims under Count III are "related more to her age related arthritis conditions that OB/GYN Care regarded as a 'disability' as opposed to asserting a claim for age discrimination under the provisions of the Age Discrimination in Employment Act ('ADEA') or a particular provision of the [IHRA]." (D. 11, p. 3). Voegel further clarifies that she "is abandoning any claim that OB[/]GYN CARE discriminated against her or retaliated against her due to her observations and reports of flirtatious actions of Dr. Santiago toward younger female employees of OB[/]GYN CARE" under the IHRA. *Id.*

Therefore, remaining for the Court's consideration are Voegel's claims for disability discrimination and retaliation under the ADA and IHRA. "Because Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework, we focus on the federal ADA claims." *Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022) (citing *Fox v. Adams & Assocs., Inc.*, 2020 IL App (1st) 182470, 445 Ill. Dec. 342, 166 N.E.3d 772, 783–88 (2020)).

### A. Disability Discrimination:

The ADA prohibits employers from discriminating against a "qualified individual" because of her disability. 42 U.S.C. § 12112(a); *see also A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) ("[D]iscrimination against disabled individuals is prohibited [by the ADA] 'on the basis of' or 'by reason of' their disability.'"). To sustain a discrimination, or disparate treatment, claim under the ADA, a plaintiff must show that she: (1) "is disabled within the meaning of the ADA; (2) "[she] is qualified to perform the essential functions of the job with or without accommodation; and (3) "[she] has suffered an adverse

7

employment action because of his disability." *Bunn v. Khoury Enters.*, 753 F.3d 676, 683 (7th Cir. 2014).

Here, OB/GYN Care concedes any dispute over the first two prongs of this inquiry by not challenging them in their motion for summary judgment. *See Costello v. Grundon,* 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.").

OB/GYN Care instead focuses its arguments on the third prong – alleging that Voegel has failed to adequately demonstrate a causal nexus between the adverse employment action and her disability. Specifically, OB/GYN Care asserts that Voegel was being treated for mobility issues at least as early as 2015, and they did not seek to change the terms of her employment until more than six years later after the following issues relating to Voegel's productivity occurred:

> (i) Voegel had two years of low productivity (2019 and 2020) where she generated less than half the revenue she had generated in the two prior years (2017 and 2018); (ii) Voegel's work productivity continued to be well below 2017 and 2018 levels during the first half of 2021; (iii) at a June 1, 2021 meeting, Voegel was presented with clear work goals to meet in order to avoid a reduction in pay; and (iv) by November 2021, it was clear that Voegel was not meeting the expectations set for her at the June 1, 2021 meeting.

D. 10 at p. 12.

"To establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether [her] disability was the 'but for' reason for the adverse action[.]" *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). "To show that disability discrimination was the 'but for' reason for" the adverse employment action,

"a plaintiff can use either direct or circumstantial evidence." *Id.* "Direct evidence would be an admission that the defendant" took the adverse employment action "on the basis of [the employee's] disability." *Id.* at 504. Circumstantial evidence may include:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Id.* (citation omitted). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also David v. Bd. of Trs. of Cmty Coll. Dist. No. 508*, 846 F.3d 216, 222–23 (7th Cir. 2017). Ultimately, regardless of the type of evidence presented, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (citing *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)).

In support of the causation element, Voegel has submitted an affidavit in which she attests that she overheard a conversation between Dr. Santiago and OB/GYN Care's then office manager, Laura Wiegand. This exchange occurred, after Voegel had fallen at work and shortly before Weigand left OB/GYN Care, which she summarized as follows:

> I did have an incident during my employment with OB GYN CARE where one of my knees buckled and I went down at the office. Dr. Santiago and Laura Wiegand, the Administrator of OB GYN CARE at the time were both aware of my fall at the office. I was able to get right back up and I did not sustain any acute injuries; but sometime after my fall, I overheard Laura Wiegand and Dr. Santiago having a closed-door conversation. I heard Dr. Santiago state something to the effect of "…we need to get rid of Vicki because she is a "fall risk" in the office; and a risk for workers' compensation." I specifically overheard this conversation between Laura Wiegand and Dr. Santiago; and I worked with both of them for several years and I recognized and could decipher their voices. Laura Wiegand left the practice

9

in November of 2020; and Blythe Carroll took over the role as Office Manager of OB GYN CARE after Laura Wiegand left.

(D. 11-1, ¶ 17).

Though OB/GYN Care denies Dr. Santiago said this in its Motion, no evidence (deposition testimony, affidavits, etc.) negating this conversation or otherwise disputing that Dr. Santiago made this statement has been produced. Rather, the only evidence OB/GYN Care produced in support of its summary judgment motion is an affidavit from Carroll, who was not yet working at OB/GYN Care at the time of the disputed conversation. Further, even if OB/GYN Care had produced such evidence, it would only create an issue of material fact not suited for summary judgment. *See Payne*, 337 F.3d at 770 (cautioning courts to resist the temptation to determine which version of the disputed event is more likely true).

OB/GYN Care also does not challenge the admissibility of Voegel's statement, nor would any objection to her testimony be successful. The Seventh Circuit has "la[id] to rest the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion," stating:

> [p]rovided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts.

*Id.* at 773. Based on the record before it, the Court finds that Voegel's statement meets this evidentiary standard for summary judgment purposes, as it includes a statement against interest by a party opponent and is based on Voegel's personal knowledge. As a result, Voegel's affidavit is "an acceptable method for a non-moving party to present evidence of disputed material facts." *See id*. Additionally, OB/GYN Care's arguments attacking the materiality of this statement and

10

whether it conflicts with Voegel's prior statements pertain to issues of credibility, which are for a jury to decide.

OB/GYN Care alternatively argues that even if Dr. Santiago made this statement it "is too slender of a reed to support a finding of discrimination under the direct method," because: (1) it is true that Voegel has mobility issues which make her a fall risk; and (2) because "the statement has no temporal proximity to any adverse employment action." (D. 10, p. 12). First, OB/GYN Care admitting that Voegel's mobility issues were a liability or fall risk supports her position. Second, while the Court agrees that the length of time between Dr. Santago's purported statement and the adverse employment action weighs in favor of OB/GYN Care, the Court cannot consider this fact in isolation, but must consider the evidence as a whole, in the light most favorable to Voegel.

When doing so, a reasonable juror *could conclude* that there is a "causal-link" between OB/GYN Care's adverse employment action and Voegel's disability. *Rozumalski*, 937 F.3d at 924; *see also Ortiz*, 834 F.3d at 765–66. Although the exact date of the conversation between Weigand and Dr. Santiago is unknown, it was over a year before Voegel was presented with a new Employment Proposal. During that year, Voegel was out of work for several months following her revision total knee replacement surgery. While she was out following that surgery, Weigand, left OB/GYN Care and was replaced by Carroll. Therefore, when Voegel returned to work, the office manager Dr. Santiago purportedly told he wanted to get rid of Voegel was no longer there.[5]

Voegel also attests by early 2021, Carroll and Bionott had instituted a practice to steer patients away from her and to Boitnott, even though it had always been OB/GYN Care's policy that the patients could choose their medical practitioner. (D. 11-1, ¶ 12). Specifically, Voegel attests:

---

[5] Although Dr. Santiago was ultimately responsible for hiring and firing OB/GYN Care staff, he would, at times, exercise that power through his office manager. (D. 10-1, ¶ 3).

11

13. During the time that Blythe Carroll was the Office Manager of OB[/]GYN CARE, she and Amanda Boitnott did institute a practice of steering patients away from my patient panel. For example, if Amanda Boitnott saw a patient on my patient panel because I was out of the office or did not have a time slot to see that patient on a particular date or time slot, then instead of adhering to the office policy of reassigning that patient back to me for any future follow up visits, Amanda would write on the tech ticket to rebook the patient on Amanda's patient panel as opposed to putting the patient back on my patient panel as had always historically been the case. This situation happened often during 2021; and this practice was contrary to the practice followed by OB[/]GYN CARE prior to 2021.

14. I personally observed patient tickets where patients on my patient panel were seen by Amanda and then rebooked at Amanda's request, on Amanda's patient panel; and in those instances, it was not done because of the patient's request; but rather because Amanda completed the tech ticket and advised office personnel to book the patient on her schedule in the future.

15. Based on my observations in the practice beginning in early 2021 there was a systematic effort by the practice's Office Manager in conjunction with Amanda Boitnott to significantly reduce the number of patients booked on my schedule whom I had previously provided care for despite the fact that I had time available on my schedule. Amanda Boitnott was also assigned to see all of the obstetrics patients; even though many of those patients had previously been on my patient panel.

(D. 11-1, ¶¶ 13–15).

OB/GYN Care disputes Voegel's position, pointing to paragraphs 49 and 50 of Carroll's affidavits, which states:

> 49. Prior to my tenure as office manager, patients receiving care from a Physician Assistant or Nurse Practitioner had been scheduled to see Voegel and Boitnott on an alternating schedule, with patient "A" being assigned to Voegel, patient "B" being assigned to Boitnott, patient "C" being assigned to Voegel, and so on. Patient preference was not considered under this prior policy.
>
> 50. During my tenure as office manager, I instituted a policy that patients could see their preferred Physician Assistant or Nurse Practitioner, be that Voegel or Boitnott. I did not institute this policy for any discriminatory reason or out of any animus towards Voegel. Instead, I believe a patient's choice as to her medical provider is a highly personal decision, especially where intimate gynecological or obstetrics care is involved, and no patient should be forced to see a medical provider with whom they are not comfortable. Moreover, I believe denying patients this basic choice and courtesy would result in patients seeking medical services from providers other than Ob-Gyn Care.

12

(D. 10-1, ¶¶ 49–50). Carroll's statement does not negate Voegel's position that in 2021 OB/GYN Care's policy was for patients to be able to choose which practitioner they saw. They also do not touch on why only Boitnott was given all the obstetric patients, and whether she was rebooking Voegel's patients with herself when the patient had not made that request. Ultimately, whether Carroll and Boitnott were intentionally directing patients away from Voegel in 2021 is disputed fact for a jury to decide. Voegel has produced some evidence that Boitnott, who was not disabled, was not following OB/GYN Care's policy of letting the patients select their provider, by requesting patients historically seen by Voegel to be rebooked on her schedule. (*See* D. 11-1, ¶ 14).

Finally, Voegel has provided evidence that OB/GYN Care's reason for terminating her because she was not meeting their business expectations was pretextual. *See Nawrot v. CPC Int'l,* 277 F.3d 896, 906 (7th Cir. 2002) ("Plaintiff may show pretext by presenting evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question or were insufficient to motivate the discharge.") (internal quotations omitted).

First, prior to the June 1, 2021, meeting there is no evidence that OB/GYN Care had discussed revenue expectations with Voegel, or that similar revenue expectations were imposed on all mid-level providers. Second, Carroll also used Voegel's revenue from 2017 and 2018 as her benchmark, which was before OB/GYN Care hired a second mid-level provider who was presumably seeing many of the patients that were previously only seen by Voegel. Third, at the June 1st meeting, the only expectation that Voegel was given was that she needed to increase her revenue by 5-10% in the next 30-60 days or her salary would be reduced. However, after 60 days had passed since the June 1st meeting, OB/GYN Care did not notify Voegel that she was not

meeting expectations or that her salary would be reduced. In fact, Voegel's revenue continued to increase following June 1st meeting.

The next time Carroll met with Voegel was on November 11, 2021, the same day another employee had submitted a note about Voegel having difficulties with her hands. By that point, the amount of revenue generated by Voegel was $180,020.88, meaning she had generated $104,407.71 in revenue since her June 1, 2021.[6] Thus, contrary to OB/GYN Care's claims, the record indicates that Voegel was meeting its financial business expectations.

In its motion for summary judgment, OB/GYN Care claims that the amount of revenue Voegel had generated by November 2021 ($180,020.88), was close to the $181,471.60 in revenue it previously deemed insufficient at the June 1st meeting. The November 2021 figure, however, does not account for the 1.5-2 months of revenue Voegel would have generated in November and December 2021 had her full-time employment as a physician's assistant continued.

Further, it appears Carroll calculated Voegel's projected revenue for 2021 by taking Voegel's average monthly revenue for the first five months ($75,613.17), dividing it by 5 to get her average monthly income ($15,122.63), and then multiplying her average monthly income by 12 ($15,122.63 x 12 = $181,471.60). Using that same formula, Voegel's average monthly income for the five months following the June 1st meeting was $20,881.54, or, more conservatively, $18,983.22, if including the first half of November.[7] This is over a 25% increase from her average monthly revenue during the first five months of 2021.[8]

---

[6] $180,020.88 (total 2021 revenue as of Nov. 2021) - $75,613.17 = $104,407.71 in revenue between June 2021 and Nov. 2021.

[7] $104,407.71 divided by 5 = $20,881.54; $104,407.71 divided by 5.5 = $18,983.22.

[8] Five-month percentage increase: $20,881.54 (average monthly revenue between 6/1/2021 and 11/1/2021) - $15,122.63 (average monthly revenue between 1/1/2021 and 5/31/2021)= $5,758.91 (difference between the post and pre-June 1, 2021, average revenue). $5,758.91 (difference in average monthly revenue post and pre-June 1, 2021) divided by $15,122.63 (pre-June 1, 2021, average monthly revenue) = 0.3808140515241066. Multiply result by 100 to express as a percentage = ~38.1. Apply same formula to calculate the increase over 5.5 using the post-June 1, 2021, average monthly revenue amount of $18,983.22.

Despite Voegel seemingly exceeding OB/GYN Care's revenue expectations, Carroll presented Voegel with the November 2021 Employment Proposal cutting her salary and hours because over "the past several years you have not been able to see the expected number of patients per day." This, however, was the first time OB/GYN Care had mentioned a patient quota expectation to Voegel. Further, as stated above, Voegel attests that Carroll and Boitnott made concerted efforts to "steer patients away from Voegel" and reassigning them to Boitnott, creating the reduction of patients on Voegel's schedule. (D. 11 at 2). According to Voegel, these efforts began in 2021 and continued until Voegel left OB/GYN Care. Thus, not only was this patient quota condition not previously mentioned to Voegel, but there is also a dispute of fact as to whether OB/GYN contributed to Voegel's failure to meet it only to use it as pretext for her demotion.

Based on these facts, a reasonable jury could find that there is both direct and indirect evidence that OB/GYN Care wanted to get rid of Voegel due to her disability. In addition to Dr. Santiago's purported statement that "…we need to get rid of Vicki because she is a 'fall risk' in the office; and a risk for workers' compensation," (D. 11-1, ¶ 17), Voegel has shown that OB/GYN Care's reason for terminating her as a full-time physician's assistant because she not meeting their legitimate business expectations was mere pretext.

Accordingly, it follows that Counts I and III of the Amended Complaint for disability discrimination survive summary judgment.

    **B. Retaliation Claims:**

The ADA "prohibits employers from retaliating against employees who assert their right under the act to be free from discrimination." *Povey v. City of Jeffersonville*, 697 F.3d 619, 624 (7th Cir. 2012) (citing 42 U.S.C. § 12203(a)). To defeat summary judgment on an ADA retaliation claim, a plaintiff must show that she: (1) engaged in a statutorily protected activity; (2) their

15

employer took an adverse action against them; and (3) a causal connection between the two. *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 856 (7th Cir. 2023). "Protected activity under the ADA includes opposition to 'any act or practice made unlawful by [the ADA] or participating in 'an investigation, proceeding, or hearing under [the ADA].'" *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024) (quoting 42 U.S.C. § 12203(a)). "Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless." *Dickerson*, 657 F.3d at 601 (citing *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007)).

Here, it appears that Voegel's position is that the same factors and analysis for her discrimination claims apply to her retaliation claims. This is not true. Unlike an ADA discrimination claim, whether someone is a "qualified individual" is not an element of a retaliation claim. *See Dickerson v. Brd. of Trs. of Cmty Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *see also Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (stating retaliation claims only require a plaintiff to establish that they "engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two."). Here, Voegel has failed to establish that she "engaged in a protected activity." Rather her argument appears to be that OB/GYN Care retaliated against her for "having a disability and exposing OB/GYN Care to liability risks." (*See* D. 11, pp. 21–22).

Because Voegel has both failed to establish that she "engaged in a protected activity," and also that there was a causal link between her engaging in that activity and OB/GYN Care's adverse employment action, the Court grants OG/GYN Care's motion for summary judgment on Counts II and IV of the Amended Complaint.

## IV. CONCLUSION

For the reasons stated above, Defendant Obstetrics and Gynecology Care Associates, S.C.'s [10] Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. OB/GYN Care's Motion is GRANTED as to Voegel's ADA and IHRA retaliation claims in Counts II and IV of the Amended Complaint. OB/GYN Care's Motion for Summary Judgment is DENIED as to Voegel's ADA and IHRA discrimination claims in Counts I and III of the Amended Complaint. The Court will contact to the Parties to schedule the final pretrial conference and jury trial.

ENTERED this 2nd day of December 2025.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge